**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

MANUEL PALOMARES,

　　　　　　　Plaintiff,

v.

CITY OF ARVIN, et al.,

　　　　　　　Defendants.

Case No. 1:21-cv-01745 JLT CDB

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

(Doc. 38)

　　　　Manuel Palomares alleges the City of Arvin, California, and two of its officers discriminated against him on the basis of disability and violated his rights under the Fourth and Fourteenth Amendments during a 2021 arrest. The matter is before the Court on the Defendants' motion for summary judgment. The motion is **GRANTED**, as explained in this order: Defendants have demonstrated that there are no genuine disputes of material fact and that they are entitled to judgment as a matter of law.

**BACKGROUND**

　　　　Palomares cannot hear, speak, read, or write. (Doc. 38-3 at 21.) The record includes inconsistent evidence about his primary means of communication. His niece and guardian ad litem, Violeta Negrete, testified in her deposition that he knows "very little" American Sign Language (ASL), only "the basics," and that he relies primarily on gestures to communicate. (*Id.*

1

at 23–24, 26.)  By contrast, Palomares's good friend of nearly thirty years, Phillip Mutz, who like Palomares is hearing impaired, testified in his deposition that Palomares does know and can use ASL, in addition to some Mexican signs and "acting."  (Doc. 40-4 at 4–5.)

There is no dispute, however, that if Palomares needs help to communicate with someone, he can rely on a video interpretation service that is available on a television and camera installed in his home and on a tablet, which he takes with him if he leaves home.  (Doc. 38-3 at 21–22.)  Through this service, Palomares can obtain the assistance of certified deaf interpreters, who can communicate with him effectively. (Doc. 38-3 at 21–22.)  Although Negrete has relied on this service to communicate with her uncle before, she believes Mutz is actually the "most efficient" and "most effective" translator for him given their longstanding friendship and Mutz's familiarity with the gestures he uses.  (*Id.* at 56.)  The record before the court evidences no dispute in this regard either.

This case is about an encounter between Palomares and two officers of the Arvin City Police Department about five years ago, in January 2021.  Mutz called Negrete in the late afternoon to say Palomares needed help.  (*Id.* at 27.)  She went to his house and found her uncle alone there, and he was in the middle of a video call on his television with an interpreter and an emergency 911 operator.  (*Id.* at 27–28.)  Negrete saw Palomares making gestures for "help," "wife," "stole," and "tablet."  (*Id.*)  By Negrete's understanding, Palomares was trying to tell the 911 operator that his wife[1] had stolen the tablet he uses to communicate with the interpretation service.  (*Id.* at 32.)

Officer Aldo Ornelas of the Arvin City Police Department came to Palomares's home to investigate his claims as a potential petty theft.  (*Id.* at 36, 65–66.)  Negrete met him at the door.  (*Id.*)  She explained that Palomares is deaf-mute, and she told Ornelas they could use the video interpretation service to speak with Palomares.  (*Id.*)  Mutz was not there, but Negrete offered his help as interpreter over a video call on her phone.  (*Id.*)  Together they called Mutz, and with his

---

[1] In the brief Palomares's attorney filed on his behalf in this matter, he offsets the word "wife" in quotation marks, as if to imply they are not in fact married. (*See, e.g.*, Doc. 40 at 7.)  He does not elaborate.  Other portions of the record suggest Palomares would claim he was deceived into signing a marriage license and is the victim of other deceptions and abuse at the hands of his wife. (*See* Doc. 38-3 at 61.)  These accusations are not material to the motion at hand, and the Court does not consider them further.

2

and Negrete's help, Ornelas exchanged a few words with Palomares. (*Id.* at 38.) Palomares said that his wife had stolen his tablet. (*Id.* at 40, 44; *see also* Doc. 40-4 at 7.) In Ornelas's deposition, he recalled that Palomares told him his wife wanted to delete pictures from the tablet in connection with "some sort of divorce" they were then going through. (Doc. 38-3 at 68.)

Ornelas went to speak to Palomares's wife in the back of the house, away from the others. (*Id.* at 38.) Ornelas asked her if she had the tablet. (*Id.* at 69.) She said no. (*Id.*) She said Palomares had come looking it and had pushed her against a wooden beam. (*Id.*) Ornelas saw no physical injuries, and she said she did not need medical attention. (*Id.* at 70.) Ornelas nonetheless suspected a misdemeanor domestic violence offense, a battery. (*Id.* at 71.) He called it in by radio, and a second officer, Armando Pantoja, started on his way over to the house. (*Id.*) Ornelas also contacted his supervising sergeant. (*Id.* at 71–72.) The sergeant agreed with Ornelas's assessment of the situation and with his decision to arrest Palomares on suspicion of battery. (*See id.* at 71.)

Ornelas went back to the front of the house, and Pantoja arrived. (*Id.* at 78.) The two officers told Negrete and Mutz they were arresting Palomares on suspicion of a domestic violence offense and needed to secure him in handcuffs. (*Id.* at 45.) They asked Negrete and Mutz to communicate this information to Palomares. (*Id.*) Mutz explained to Palomares that the officers were arresting him for domestic violence based on Maria's accusation that he had pushed her. (*Id.* at 47.) Palomares denied pushing his wife and accused her of lying. (*See id.* at 48–50.) Negrete relayed that accusation to the officers. (*Id.* at 48–50.) But the officers were not swayed, and eventually, when he saw his protests were ineffective, Palomares allowed the officers to fasten handcuffs around his wrists. (*Id.* at 51.) Pantoja sat Palomares in his patrol car and drove to the County Jail. (*Id.* at 80.)

After Pantoja took Palomares away, his wife asked Ornelas for a restraining order. (Doc. 38-3 at 52–53.) Ornelas phoned the on-call judge to request an emergency protective order, but the judge denied the request. (*Id.* at 74.) The parties have not presented any evidence showing whether prosecutors considered or pursued charges against Palomares.

Palomares filed this action in December 2021. (Doc. 1.) He asserts four claims against

3

the City of Arvin, the County of Kern, Ornelas, and Pantoja: (1) deprivation of due process in violation of the Fourteenth Amendment and 42 U.S.C. § 1983, (2) a violation of the Fourteenth Amendment's Equal Protection Clause and § 1983, (3) a violation of the Americans with Disabilities Act of 1990, and (4) a violation of the Rehabilitation Act of 1973.  As noted, Negrete is acting as his guardian ad litem.  (Doc. 35.)  The Court dismissed the claims against the County by the parties' stipulation in January 2024.  (Docs. 52–53.)  The remaining defendants (the two officers and the City) have moved for summary judgment.  (Doc. 38.)  That motion is fully briefed (*see* Docs. 40, 42) and the Court finds it is appropriate to decide without a hearing.

## STANDARD OF DECISION

The Court can grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

If the moving party fails to carry this initial burden, the nonmoving party has no obligation to produce anything. *Id.* at 1102–03.  That is true even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.*  But if the moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49.  To carry this burden, the

4

nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the Court must grant the motion. *Id.* at 322.

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in that party's favor. *Anderson*, 477 U.S. at 255. The Court does not make credibility determinations or weigh evidence. *Id.* But conclusory, speculative testimony does not raise a genuine issue of fact. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Nor does the Court rely on evidence that cannot be presented in a form that would be admissible at trial. *See* Fed. R. Civ. P. 56(c).

**DISCUSSION**

**I.    Due Process**

Palomares's first claims the officers deprived him of due process. The Due Process Clause of the Fourteenth Amendment prohibits states from depriving any "person" of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Courts have long interpreted this clause as offering two distinct protections. First, its "procedural" component promises adequate procedural protections when a state or local government deprives a person of a constitutionally protected interest in liberty or property. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 & n.7 (1972). Second, its "substantive" component prohibits "arbitrary" government actions "regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

Palomares does not allege specifically in his complaint whether he is pursuing a claim based on inadequate procedures or arbitrary government actions.  In his opposition to the pending motion, however, Palomares does not contend the officers' actions were arbitrary in the constitutional sense.  He relies instead on the Supreme Court's decisions in *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005) and *Sandin v Conner*, 515 U.S. 472 (1995).  (Doc. 40 at 12–14.)  In *Gonzales*, the Supreme Court considered whether a person's interest in the enforcement of a restraining order was a protected "property interest" and thus covered by the "procedural component of the Due Process Clause."  545 U.S. at 755.  In *Sandin*, the Court examined whether a state prison regulation afforded an inmate "a protected liberty interest that would entitle him to the procedural protections" it had recognized in previous cases.  515 U.S. at 487.  The Court thus interprets Palomares's first claim as an assertion of his right to adequate process only and finds he has waived any "substantive" claim.

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.'"  *Gonzalez*, 545 U.S. at 756 (quoting *Roth*, 408 U.S. at 577).  The Constitution does not create these "entitlements."  *Id.*  "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  *Id.* (quoting *Paul v. Davis*, 424 U.S. 693, 709 (1976)).

The officers argue Palomares could not prove at trial that they deprived him of any such protected interest.  In response, Palomares relies on California Evidence Code section 754 to argue that he had a protected "liberty interest" in "effective communication" under state law.  (Doc. 40 at 13–15.)  Section 754 requires peace officers to make "a good faith effort to secure the services of an interpreter without any unnecessary delay" when they question or interview "an alleged victim or witness who demonstrates or alleges deafness or hearing loss."  Cal. Evid. Code § 754(j). Officers are excused from this obligation in two circumstances: first, if "the individual who is deaf or hard of hearing affirmatively indicates that he or she does not need or cannot use an interpreter," and second, if "an interpreter is not otherwise required by Title II of the federal

6

Americans with Disabilities Act of 1990 . . . and federal regulations adopted thereunder." *Id.* Under one such regulation, a "public entity" may rely on "an adult accompanying an individual with a disability to facilitate communication" if the person with a disability "specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances." 28 C.F.R. § 35.160(c)(2).

Palomares cites the Arvin Police Department's written policy. It includes requirements that parallel those in the state Evidence Code and ADA regulations above. Under one provision, "It is the policy of the Arvin Police Department to reasonably ensure that people with disabilities, including victims, witnesses, suspects and arrestees have equal access to law enforcement services, programs and activities." (Doc. 40-8 at 2.) Members of the Police Department "must make efforts to communicate effectively with individuals with disabilities." (*Id.*) Officers must "carefully consider the circumstances" before relying on "family and friends of a disabled or impaired individual." (*Id.* at 4.) They should consider "the nature of the contact and the relationship between the disabled individual and the individual offering services." (*Id.*) A "suspect," for example, may not be an appropriate interpreter for potential "victim." (*Id.*)

The record demonstrates beyond dispute that during Palomares's encounter with the two defendant officers, he requested and received the help of his friend Phillip Mutz, who is the most "efficient" and "effective" interpreter for him, and his niece, Violete Negrete, who now serves as his guardian ad litem. (Doc. 38-3 at 101.) Palomares never asked for a different translator or interpreter, such as an ASL interpreter. (Docs. 38-3 at 42, 40-4 at 8.) Nor does any evidence suggest Negrete or Mutz did not facilitate an effective exchange between Palomares and the officers. The circumstances did not show their interests diverged from his or that it would not be reasonable to rely on their help. To the contrary, in a statement Negrete prepared a few days after the arrest, she wrote that "through the entire ordeal there was a proper means of communication available to speak and be understood." (*See* Doc. 38-3 at 59.) By all accounts, the officers understood Palomares's statements about his wife and her allegations against him. They simply refused to credit them. In sum, Palomares has not cited evidence that could prove the defendant

7

officers deprived him of a constitutionally protected liberty or property interest.  And for that reason, it is not necessary to decide whether the officers followed an adequate process, *see Gonzales*, 545 U.S. at 768 & n.14, nor whether they are entitled to qualified immunity.  The Court grants the motion for summary judgment of claim one.

## II.    Equal Protection

In Palomares's second claim, he alleges the officers discriminated against him "on the basis of deafness or being hard of hearing" in violation of the Fourteenth Amendment's Equal Protection Clause.  (Doc. 1 ¶ 29.)  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV § 1).  But state and local governments "are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational."  *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001).  If an officer's actions were rational against the backdrop of the undisputed facts, then that officer is entitled to summary judgment.  *See, e.g., Bonner v. Lewis*, 857 F.2d 559, 565 (9th Cir. 1988) (affirming summary judgment of an equal protection claim by deaf and mute inmate against prison officials because officials rationally relied on "a telecommunication device and inmate interpreters" rather than "qualified sign language interpreters").

The officers argue their actions were rational.  Palomares does not cite evidence that could prove otherwise.  As summarized in the previous section, the undisputed record shows the officers relied on Negrete and Mutz to communicate with Palomares, and he did not request a different translator or interpreter.  It was rational for the officers to rely on Negrete and Mutz rather than another interpreter in these undisputed circumstances.  The Court grants the motion for summary judgment of the second claim, again without reaching the officers' assertion of qualified immunity.

## III.    Disability Discrimination

The parties agree that the Court should analyze Palomares's third and fourth claims—

8

under the ADA and the Rehabilitation Act, respectively—in conjunction and against the same legal standard.  (*See* Docs. 38-1 at 11–12; 40 at 9); *see also Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act.").  The parties also agree Palomares cannot pursue his ADA or Rehabilitation Act claims against the individual officers.  (*See* Docs. 38-1 at 12; 40 at 9.)

The City interprets Palomares's ADA and Rehabilitation Act claims as asserting that it "violated his rights . . . by not providing him with a sign language interpreter."  (Doc. 38-1 at 5.) Palomares does not pursue this theory of liability in opposition to the City's motion.  He argues instead that the officers (1) "failed to effectively communicate" with him; (2) "took the word of the person who could talk, his wife, and arrested the person with the disability"; and (3) did not "communicate substantively with [him], much less question him about the alleged assault."

The first of these theories contradicts the undisputed record.  No evidence shows the officers communicated ineffectively with Palomares or refused his requests for a translator or interpreter.  It is also undisputed that Palomares was able to tell the officers his wife was lying. The second and third theories, by contrast, fall short as a matter of law.  Palomares cites no authority showing that officers must credit the statements of a hearing-impaired suspect over the statements of a person who can hear, nor that the law obligates officers to interview a hearing-impaired suspect before making an arrest.  The Court's independent searches have yielded no authority that court support such a claim.

Nor does the record include evidence that could show the officers' decisions were tied to Palomares's disability.  Officer Ornelas testified without contradiction that he decided to arrest Palomares based on his wife's allegation that he pushed her during a dispute about the tablet and that he confirmed this decision with his supervisor independently of Palomares's later denial. Palomares does not cite any portions of the record that could show otherwise at trial.  To the contrary, the evidence undermines his position.  The Police Department's policy on domestic abuse, which Palomares cites, specifically instructs officers that they may *not* decline "to take enforcement action" based solely on a "[d]enial that the abuse occurred," regardless of any

9

disability.  (Doc. 40-7 at 3.)  As Palomares acknowledges, he cannot succeed at trial without proving the alleged discrimination was "because of" his disability.  (Doc. 40 at 9–10 (citing *Brown v. City of Los Angeles*, 521 F.3d 1238, 1941 & n.3 (2008)).)  The Court therefore grants the motion for summary judgment of claims three and four.

**IV.    Unlawful Arrest**

Although Palomares does not assert an unlawful arrest claim in his complaint, the defendant officers anticipated the possibility of such a claim during discovery and in their moving papers.  (*See* Docs. 38-1 at 11–13, 42 at 6.)  The Ninth Circuit has held that it is not necessary to "plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case."  *Pac. Coast Fed. of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1087 (9th Cir. 2019) (quoting *Am. Timber & Trading Co. v. First Nat'l Bank of Ore.*, 690 F.2d 781, 786 (9th Cir. 1982)).  The Court has therefore considered whether there is any genuine dispute of material fact related to a claim of unlawful arrest in violation of the Fourth Amendment.

The Fourth Amendment prohibits unreasonable searches and seizures.  "In general," it is unreasonable for police officers to "enter a person's home to arrest him without obtaining an arrest warrant."  *United States v. Brobst*, 558 F.3d 982, 997 (9th Cir. 2009).  But under an exception to this general requirement, officers may make a warrantless arrest if they have "probable cause."  *Id.*  Probable cause is "more than bare suspicion."  *Brinegar v. United States*, 338 U.S. 160, 175 (1949).  It requires "'reasonably trustworthy information' about the relevant 'facts and circumstances' that would suffice to permit a 'prudent person' to believe the suspect 'had committed or was committing an offense.'"  *Brye v. City of Stockton*, No. 23-00343, 2025 WL 3089389, at *6 (E.D. Cal. Nov. 5, 2025) (quoting *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007)).  As this language implies, the standard is objective.  *See Edgerly v. City & County of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010).

The defendant officers argue they had probable cause to suspect a battery in violation of California Penal Code sections 242 and 243(e).  (*See* Doc. 38-1 at 19).  "A battery is any willful and unlawful use of force or violence upon the person of another."  Cal. Pen. Code § 242.  The California Supreme Court has held that "the least touching may constitute battery."  *People v.*

*Rocha*, 3 Cal. 3d 893, 899 n.12 (1971) (citation omitted).  "[F]orce against the person is enough, it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark."  *Id.*  The state supreme court has also held that the "willful" and "unlawful" requirements of section 242 are satisfied if the force or violence is "harmful or offensive." *People v. Pinholster*, 1 Cal. 4th 865, 961 (1992), *disapproved of on other grounds by People v. Williams*, 49 Cal. 4th 405 (2010).  Under section 243(e) of the state Penal Code, battery against a spouse or cohabitant is punishable by a fine, imprisonment in a county jail for up to a year, or both.

The undisputed record shows in this case that Palomares's wife told Ornelas that Palomares had pushed her into a beam during a domestic dispute, and Palomares told Ornelas their disagreement was connected to pictures on the missing tablet and possibly an ongoing divorce proceeding.  Although Palomares denied his wife's accusation that he pushed her, he made clear to Ornelas that he believed she had stolen his tablet and had spoken with her about it. The parties do not dispute that she was his wife or cohabitant at the time.  A prudent person could have believed based on this information that Palomares had used "force" in a "harmful" or "offensive" way against a spouse or cohabitant in violation of sections 242 and 243(e).  The Court therefore grants the motion for summary judgment on Palomares's implied claim of unlawful arrest in violation of the Fourth Amendment.

### V.     Constitutional Claims Against the City

Palomares also asserts a constitutional claim against the City itself under 42 U.S.C § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978) for maintaining an unlawful policy or practice.  The City cannot be liable for maintaining an unconstitutional policy or practice under § 1983 if there was no "underlying constitutional violation."  *Lockett v. County of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020).  The Court thus grants the motion for summary judgment of Palomares's constitutional claims against the City.

///

///

///

11

## CONCLUSION

The motion for summary judgment (Doc. 38) is **GRANTED**.  The Clerk's Office is directed to enter judgment in favor of all remaining defendants and to close this case.

IT IS SO ORDERED.

Dated:    **January 16, 2026**

UNITED STATES DISTRICT JUDGE

12